Filed 10/8/24; certified for publication 10/29/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re H.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br>v.<br>H.B.,<br><br>        Defendant and Appellant. | A169493<br><br>(San Francisco City & County Super. Ct. Nos. JD23-3241. JD23-3241A) |

H.B. (father) appeals from a disposition order declaring his two sons dependents of the juvenile court, vesting the continued custody of the children with their mother, and granting family maintenance services to mother and supportive services to father. Father argues the disposition findings must be reversed as to him because the juvenile court applied an incorrect legal standard and insufficient evidence supports its findings. Finding merit to some of his contentions, we reverse the disposition order and remand.

1

## BACKGROUND

### Original Petition and Detention

On August 1, 2023,[1] the San Francisco Human Services Agency (Agency) filed a petition on behalf of H.B. (then age 15) and D.B. (then age 12), alleging the minors were at substantial risk of suffering physical and emotional harm, that their parents, father and G.B. (mother), failed to protect the minors, and that the minors were at risk of suffering serious emotional damage. (Welf. & Inst. Code, § 300, subds. (a), (b) & (c).)[2] The petition alleged father had purchased for and given H.B. Xanax, psilocybin mushrooms, and marijuana, which in turn had the potential to exacerbate H.B.'s anxiety and depression. The petition further alleged that father had his own substance abuse issues.

According to the detention report, the Agency received a referral on July 6 based on mother's report that father had given H.B. Xanax, psilocybin mushrooms, and marijuana. On other occasions, H.B. allegedly stole drugs from father. The police were called to the home while both father and H.B. were intoxicated. The police advised father to obtain a medical marijuana card.

On July 24, the Agency went to the family home and interviewed H.B., D.B., and mother. H.B. reported he used marijuana for his anxiety, even though his parents were against it and his psychiatrist recommended antidepressants and not marijuana. H.B. said he obtained the marijuana from "random people" at school and denied that father had given him or helped him buy it.

---

[1] All further dates refer to the year 2023 unless otherwise stated.

[2] Further undesignated statutory references are to the Welfare and Institutions Code.

D.B. told the social worker he did not use drugs, but his brother used marijuana. Father wanted H.B. to " 'go slow' " in using marijuana, while mother wanted H.B. to stop. When H.B. was under the influence, he did not rest or sleep and had mood swings. When he was not under the influence, he was sad. D.B. said he was the one who had called the police during the earlier incident, because H.B. threw a tantrum and tried to hit mother. Father intervened and pinned H.B. down until the police arrived. D.B. said this felt " 'normal because [his] brother is always throwing tantrums like this.' "

Mother reported she had confiscated H.B.'s phone because he regularly missed curfew, appeared under the influence, and smelled like marijuana. Mother had the passcode to his phone and saw messages indicating father was the one giving H.B. drugs. She showed and sent screenshots of those messages to the Agency. Father bought H.B. a new phone after mother confiscated his other one.

According to mother, H.B. did not listen to her. Father and H.B. did not include her in conversations or give her information about how H.B. was doing in therapy or whether he was taking his medication. Father called mother " 'crazy' " or threatened to call the police and report that she was having a mental crisis when she pleaded with father to keep her " 'in the loop' " about H.B.

The social worker found in H.B.'s bedroom a pocketknife, smoking paraphernalia, an empty prescription bottle, small pieces of foil-like paper, and a half-full pack of a sleep sedative.

On July 28, the Agency obtained a removal warrant. When social workers went to the family home to execute the warrant, the parents agreed

3

that father would leave the home and that mother would remain in the home with the children.

In the detention report, the Agency listed its "reasonable efforts [¶] . . . made to prevent or eliminate the need for the child's removal from the home," which included two upcoming child and family team meetings and a referral for father to submit to drug testing and a substance use assessment.

The Agency recommended that the children be removed from the custody of father and placed temporarily with mother.

At the detention hearing on August 2, the juvenile court adopted the Agency's recommendations and ordered supervised visitation and phone calls for father, but granted the Agency the discretion to move the visits to unsupervised with 48 hours' notice.

**Jurisdiction and Disposition**

***Disposition Report***

On September 15, the Agency filed its disposition report in advance of the combined jurisdiction and disposition hearing set for November 2. Although entitled "Disposition Report," it included recommendations concerning jurisdiction. Protective Social Worker (PSW) Jessica Navidad wrote the report.

The report discussed the facts supporting jurisdiction, quoting at length various conversations between H.B. and father indicating father had purchased for or given H.B. marijuana and psilocybin mushrooms.[3]

---

[3] For example, on July 20, H.B. texted father, " 'Can I get some shroom capsules[?]' " Father replied, " 'Hey, dude, I think I actually have some of those. How much? $5/pill. They're like 0.2 each.' " Father also texted H.B., " 'Ugh. Ok. So that's what . . . $180? Ok. On 19th at Lincoln is gas station. In men's room under sink is an obviously loose tile. Move that and is a space. Put $180 there then text. Then I'll text after ive [*sic*] counted it. Thanks.' "

4

The report then discussed the family's history and current dynamics. Mother stated that after being together with father for about 19 years, mother wanted to end their marriage. She had filed for divorce the year prior, which case was pending. Father reported past domestic violence incidents with mother, who had hit him, thrown objects towards him and H.B., called him names, whipped him with cords, threatened to stab him, made sexually explicit comments, and damaged his property. Mother admitted she had " 'exploded' " in her reactions toward father.

Father reported he fed the children, cleaned the home, supported the children with homework, and contacted H.B. when he was late for curfew. Mother said she was the primary caregiver. She was not working, and father paid for the rent and bills.

According to mother, D.B. listened to her, while H.B. did not. H.B. was aggressive towards mother and D.B. D.B. told mother he wanted to leave the home because of H.B.'s behavior.

Mother felt unsupported by father when he was living with them because he disregarded her parenting style, which she described as a form of emotional abuse. She did not agree with father's parenting style, because he "just [went] along with what [H.B.] sa[id]," including allowing him to attend concerts, hang out with his friends, and miss school. Father acknowledged he was undermining mother and that both he and H.B. needed to be mindful of how they made mother feel.

The report went on to describe father's struggles with substance abuse and recent efforts to address it. Father drank alcohol and used Xanax. He was enrolled in an outpatient treatment program with Kaiser Permanente (Kaiser) at the time. He was also engaged in treatment with the Homeless Prenatal Program, as well as the San Francisco County Family Treatment

5

Court. During the past year, father had been seeing a psychiatrist specializing in addiction. Additionally, father reported his support system included members of the Narcotics Anonymous (NA) community. Father submitted to drug tests in August. His results all showed he had tested positive for marijuana and benzodiazepines.

The report turned to the children's health. H.B. had been diagnosed with anxiety and depression. Father admitted he knew that H.B. had been actively using drugs since late 2022. Father took H.B. to Kaiser for substance use, as well as to NA meetings, but H.B. did not seem to connect with the program.

Mother first realized H.B. was using drugs in February when he came home "high." Father had no reaction to H.B. being high and stated to mother that H.B. " 'has to learn to be a man and that he's "living his culture." ' " Mother would tell father that she wanted to find the person giving H.B. drugs, and father would respond, " 'The world gives him drugs.' "

Mother and the staff at H.B.'s high school expressed concerns about H.B.'s health and behaviors. For example, on September 5, H.B. appeared under the influence at school. When mother picked him up and took him to the hospital, he tested positive for opioids. Mother reported that she had hidden her pills from H.B., who managed to find and steal them. Also, according to the school's social worker, Sophie Wasacz, H.B. was part of a group of students who bought and sold drugs. H.B. was missing class, too.

There were also incidents involving H.B. at home. On September 13, mother contacted PSW Navidad and the police regarding an altercation between mother and H.B. after he looked through mother's phone and saw screenshots of his conversations with others about his substance use.

Mother brought H.B.'s cell phone to a meeting with PSW Navidad. The phone contained various texts, audio messages, pictures, and videos indicating that H.B. was smoking marijuana, using a vape pen, taking pills, asking for "molly," smoking an unknown substance from tin foil, and using a portable vaporizer for consuming cannabis concentrates.

The Agency referred H.B. to individual therapy. It also consulted with a substance abuse manager, who advised that H.B.'s substance abuse was secondary to his mental health needs and recommended that he stabilize his mental health. H.B. also had an individualized education plan (IEP).

Mother took H.B. to NA meetings and attempted to connect him to multiple substance abuse programs but was unsuccessful. Father was also concerned about H.B.'s substance use, but he continued to deny providing him with illicit drugs. Father claimed H.B. had stolen drugs from him. Father stated he wanted to support his children and was working on his own sobriety.

The Agency scheduled visits between father and the children starting on September 6 for two hours per week under the supervision of PSW Keyla Cordero. D.B. attended the visit that day; H.B. missed it because he did not want to attend. PSW Navidad encouraged H.B. to attend his next visit. H.B. replied that he did want to attend visits, but that he had made plans to see friends. On September 13, D.B. and father had a visit, which went well.

The Agency listed its "reasonable efforts" during the reporting period, which included conducting a meeting with father on September 6 and requesting that he provide a release of records from Kaiser.

The report concluded with this assessment: "This family has a lot of issues that have been building over the years and have contributed to [H.B.] being in the current state he is. . . . It is going to take an immense amount of

work for [H.B.] to stabilize his mental health and substance abuse. Unfortunately, this work is not going to happen overnight as it took years to get here. . . . The parents are going to need to stop pointing fingers at whose fault it is that [H.B.] is in the condition that he is and present a united front in getting him the needed support." The Agency added that father "should take this time to work on his sobriety and improve his parenting skills to be able to meet his children's needs in an appropriate manner."

The Agency recommended that the juvenile court sustain the petition allegations; declare the children as dependents, to reside in the home with mother under the Agency's supervision; grant mother family maintenance services; and grant father supportive services only.[4] It recommended the following supportive services for father: individual therapy, drug testing, parenting classes for adolescents, and an outpatient recovery program, plus follow-up on any additional referrals from the program or the Agency for aftercare.

### *Addendum Report*

On October 20, the Agency filed an addendum to the disposition report, also authored by PSW Navidad. Mother shared that H.B.'s behaviors had improved since the week prior, as he was less aggressive. Also, H.B. was scheduled to start therapy to address his anxiety and depression. His school's social worker, Wasacz, said she recently had not seen H.B. engage in drug dealings, found any drugs in his backpack, or noticed any physical signs

---

[4] "[F]amily maintenance services are activities designed to provide in-home protective services to prevent or remedy neglect, abuse, or exploitation, for the purposes of preventing separation of children from their families." (§ 16501, subd. (g).) "Supportive" or "[e]nhancement" services "are child welfare services offered to the parent not retaining custody, designed to enhance the child's relationship with that parent." (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1497, fn. 1.)

8

that he may be under the influence. H.B. shared that his relationship with his mother was getting better.

The report also provided updates on father's substance use assessment. Father was taking Xanax and benzodiazepines daily from sometime in February to August 4; drinking zero to four beers daily, with his last drink in mid-July; taking Adderall two to three days per week, with his last use in June or July; smoking marijuana daily, with his last use in June or July; and ingesting psilocybin mushrooms two to three times per month, with his last use in June. Father shared he had a significant history of substance abuse, relapse, and treatment. Father was connected to NA between 2001 and 2005. He relapsed and checked himself into rehabilitation after abusing cocaine in 2007. He had sporadic use and abstinence since then. He went to rehabilitation in 2012 for abusing OxyContin. In November 2022, father relapsed on what he believed was cocaine but turned out to contain fentanyl, on which he ended up overdosing. Father also reported that he had woken up from a blackout a few weeks prior to the Agency intervening in this case. Father expressed his relationship with mother was difficult and that he used substances to " ' "check out," ' " but that he felt solely responsible for his substance abuse. He also had a history of experiencing panic and anxiety and used substances to cope.

Father provided PSW Navidad with his records from Kaiser. The records verified his participation in its outpatient treatment program and contained his drug test results. Father's physician noted father had been testing since August for cannabis, sedative, and opioid use disorder. Father's test results were positive for benzodiazepines, but this did not reflect " 'new use' "; rather, it reflected " 'metabolites' " of the drug he had prior to starting treatment. His results were positive for THC, which was " 'expected given

the high concentration of THC in [his] initial test,' " and did " 'not indicate ongoing THC use since early August.' "  PSW Navidad added that father "continue[d] to test positive for Buprenorphine and Norbuprenorphine but his levels continue to decrease."

Father's outpatient program with Kaiser was scheduled to finish in November.  According to his records, his treatment goals included identifying his triggers for relapse, identifying and developing coping skills, building a social support system, and improving his self-respect and self-esteem.

As for visitation, the report noted that on October 4, neither minor attended; D.B. did not want to attend and H.B. wanted to spend time with friends instead.  Both attended a visit on October 11.  Father engaged with them and attempted to give each of them an equal amount of attention.  On October 18, H.B. reportedly did not want to attend his visit with father that day.

The Agency "acknowledge[d] [father's] hard work in maintaining his sobriety thus far."  It reported, however, that father had not identified what his plans were upon completing the Kaiser program.  The Agency noted that in light of father's past history of sobriety and relapse, he needed "intensive support around to achieve longer term sobriety," which was "imperative in helping [H.B.] . . . with his own recovery."  The Agency "need[ed] additional time, [more] than three months, to assess how [father] does with his sobriety."  The Agency wished "to work with [father] through his sobriety journey through supportive services and rebuild a healthy and respectful relationship between him and his sons."  The Agency continued to recommend family maintenance services for mother and supportive services for father.

*Trial Briefs*

On October 27, father filed a "trial brief" for the upcoming jurisdiction and disposition hearing, along with his supporting declaration. Father contested the Agency's recommendations, which he characterized as seeking the removal of the children from his care, their continued placement with mother, and the provision of supportive services to father. Therefore, father argued that at disposition, the juvenile court must make removal findings under section 361, subdivision (c)(1).

Father contended the Agency could not meet its burden. Father maintained the Agency presented no "evidence of current risk" he posed to the children, and that its recommendations were based on its "subjective belief that [father] ha[d] not been sober long enough."

Father claimed the evidence instead established he had "taken full responsibility for the harm he caused his children and ha[d] done everything possible to mitigate that harm." In his declaration, father stated he started attending NA meetings on July 24; enrolled in Family Treatment Court on August 16; graduated from Kaiser's full-time, three-week outpatient program on August 30; and at the time, was participating in Kaiser's Addiction Medicine and Recovery Services Intensive Recovery Program, an eight-week program consisting of outpatient therapy and educational services at least four days per week, two to three hours per day. Father also stated he had become aware of the stressors that had triggered his prior relapses over the past 23 years. Father was "much more confident" in his recovery this time, because he had "more and better tools to manage [his] emotional triggers and questionable situations before they bec[a]me overwhelming," including building a supportive network. And he believed that having moved away

11

from mother had "allowed [him] to reevaluate [his] life" and engage with mother in a "more healthy and productive way."

Father also complained about the Agency's failure to expand visits from supervised to unsupervised, asserting it failed to accommodate a request made by H.B. at a settlement conference hearing the month prior to separate his visits with father from father's visits with D.B.

Father asked the juvenile court to return the children to his care and grant him the same family maintenance services recommended for mother. Alternatively, should the court remove the children from his care, father asked that he be given family reunification services.

On November 1, the Agency filed a response, asserting that "the children have not been removed from all parental care, and are not entering foster care," and thus father was not entitled to family reunification services. The Agency also suggested that father would receive no benefit if given family maintenance services instead of supportive services, since the supportive services being recommended were "the same services that would be offered if he were eligible for family reunification services."

### *Assumption of Jurisdiction*

The combined jurisdiction and disposition hearing began on November 2. During the morning session, the parties submitted on the allegations of an amended petition. Pursuant to section 300, subdivision (b)(1), the amended petition alleged the parents failed to protect H.B. and D.B. because (1) father provided or left unsecure substances including Xanax, psilocybin mushrooms, and marijuana, to H.B., and (2) father had a history of substance abuse. It also alleged father "stopped using illicit substances in July 2023" and that "he has not used illicit substances since ending his medically supervised taper of benzodiazepines on August 4,

12

2023." The amended petition further alleged H.B. was at risk of suffering from emotional damage under section 300, subdivision (c), as his "parents have been unable to provide appropriate mental health and substance abuse treatment" for him.

The juvenile court sustained the allegations and assumed jurisdiction over H.B. and D.B.

### Contested Disposition Hearing

The juvenile court held the contested disposition hearing on the afternoon of November 2, and then on November 13 and 30 and December 18 and 20. It admitted into evidence the Agency's detention, disposition, and addendum reports, as well as exhibits presented by father. The court also heard testimony from various witnesses.

On November 2, PSW Cordero testified she supervised the visits between father and the children. Of the nine scheduled visits, H.B. attended only three. Overall, the visits with the children were "really good." Father confirmed his visits and showed up on time. He brought food, puzzles, and toys to the visits. He also engaged with the children and listened to what they had to say. At the first visit, H.B. seemed shy or anxious and less engaged, but he improved during the third visit.

Cordero testified that while the visits were good overall, she had "one concern," which was that father was "very willing to say yes to his kids" to their requests for material things or to do certain activities such as see a movie. She explained that "even though you expect parents to provide for their kids, to me that is a bit concerning, you know, because there's times in which you do need to say no to your kids."

PSW Navidad also testified on November 2. She stated the Agency was not open to a dual family maintenance case or a case where the children

would be in-home with both mother and father. The Agency was concerned about father's sobriety, H.B.'s own substance abuse, and how the two of them being in the same house would affect them both. Navidad testified that the supportive services recommended to father in the disposition report had been referred to him "as of today."

Navidad testified father was living with a friend. Father had not asked the Agency to assess his home as a possible placement for the children. Since father left the family home, H.B.'s substance use apparently decreased and he had improved academically.

Navidad understood that father had recently completed a treatment program with Kaiser. However, she had not explored a safety plan or some way of mitigating her concerns about father and his sobriety. Nor had she asked father about his future plans for recovery, stating she and father did not yet have their monthly meeting.

Navidad acknowledged father's "hard work" but stated "three months isn't enough time for the [A]gency to assess long-term sobriety." She based her opinion in part on father's history of substance abuse and his various relapses over the years. Navidad had not spoken to anyone at Kaiser or any of father's providers.

When asked if she thought father over the last three months had been using illicit drugs that he had not been prescribed, Navidad responded, "He has been testing presumptive positive but his levels have been decreasing." Navidad did not know the specific drugs he had been testing positive for, including Suboxone. And she could not recall if she previously had looked up any of the drugs.

Navidad recently had referred father to Mission Council, a substance abuse treatment program. Navidad testified that she could not provide a

14

specific timeframe about how long was long enough for assessing father's ability to maintain long-term sobriety. She said that it "[h]as to be assessed as it goes."

As far as visitation, Navidad testified that the Agency "would like [H.B.] to participate more in his visitation to get a better assessment of his and his father's relationship to see how they interact and how they engage."

Navidad's examination continued through the hearing on November 13. According to a recent visit on the Friday prior, H.B. expressed that moving visits from Wednesdays to Thursdays would encourage him to attend. She told him that she "could inquire about that" but could not promise she could move the visits. She said that the Agency would submit a referral with the request to the family resource center, which would then place the family on a waitlist. Navidad testified, "I can inquire about changing visits to encourage [H.B.] to attend visits, but the other part is that [he] has to attend them himself. I can't force him to go to those visits." Navidad also testified that the Agency could not expand visits from the current schedule of two hours per week to three hours per week, due to a lack of staff. Further, Navidad explained the Agency lacked resources to separate visits between H.B. and D.B.

On November 30, Jennifer Pasinosky, a program coordinator with the San Francisco County Family Treatment Court for the past 16 years, testified on father's behalf. Family Treatment Court is a court-supervised treatment and parenting program for people with children who are involved in the juvenile dependency system. It focuses on child safety with the primary goal of reunifying the family.

Father began participating in Family Treatment Court on August 16. Pasinosky was aware that father had participated in the Kaiser intensive

15

treatment program.  Father shared with her his "individual aftercare plan," which was to work with a sponsor doing "step work."  That involved him working on assignments, reading materials, speaking with his sponsor daily, and attending meetings numerous times per week.  Father was also working with a substance use disorder counselor with the Homeless Prenatal Program.

According to Pasinosky, father demonstrated "a willingness and openness to examine his triggers."  He was working on addressing those triggers, including by not allowing himself to be isolated and by creating a strong network of people in recovery group meetings.  Father also appeared to have a strong support system.

When asked about father's drug tests results, Pasinosky pushed back on PSW Navidad's testimony insofar as she suggested father's drug test results indicated "problematic substance use."   Pasinosky clarified that while father continued to test positive for buprenorphine (a different name for Suboxone), such results did not indicate "problematic substance use."  Instead, they indicated father was "testing positive for a prescription medication . . . for treatment of his substance use disorder."

Pasinosky testified that the typical length of a parent's participation in Family Treatment Court is from 10 to 18 months.  She considered father to be in the "orientation phase" of the program.  Based on her experience, the longer an individual has used substances, the higher the risk of relapse.  In father's case, "It is hard to say exactly in this moment if [he] is going to return to use.  We don't know exactly, but I think the indications right now are that he has shown a lot of openness and willingness to engage in a plan that creates a foundation for long term recovery."  Pasinosky also said, "Once you get to the 90-day mark and you are really, like, proactively engaged, we

like that. . . . [¶] So I guess if you wanted a number, I would say 90 days where I would start to say this person is more serious . . . ."

In Pasinosky's experience, parents have relapsed while participating in Family Treatment Court. But she never had a case where a parent had provided illegal substances to a child.

On December 18 and 20, father testified. He admitted giving H.B. marijuana and mushrooms, but not Xanax; he believed H.B. stole it from him or obtained it outside of the home. Father deeply regretted giving his son drugs. He acknowledged "[i]t was extremely poor judgment." Father was using drugs at that time and his addiction caused him to have poor decisionmaking and boundaries.

Father testified he was "very clean now and very active in [his] recovery program." Consistent with his declaration in support of his trial brief, father testified about the various treatment programs he completed or was participating in. Father also was attending individual therapy. Father stated he was learning how to address his stressors with the help of his sponsor and regular meetings with other people in recovery. After completing the second treatment program with Kaiser in early November, he returned to his employment.

Father spoke with PSW Navidad once per month. Shortly after the first day of the disposition hearing on November 2, they met in person for no more than 10 minutes. Separately, Navidad e-mailed father with a referral to Mission Council, a recovery program. However, father replied to her, stating the program was not a good fit, because it conflicted with his work schedule and, in any event, he was then presently attending more meetings, classes, and counseling sessions that would be offered at Mission Council.

17

Father testified that Navidad did not ask him about his long-term recovery plans in their recent communications.

Father expressed that if he were to reunify with H.B., he would parent him differently by establishing healthier boundaries. Father stated, "My role is to be a father for him, and I think previously in my mind I had been trying to be a doctor, trying to be his therapist and psychiatrist. I have been trying to be a friend . . . ."

Father also testified that mother recently had contacted him to discuss H.B. and his problematic behavior. On one occasion, mother called father about H.B. bringing a knife to school in an effort to defend himself. Father then called H.B., who disposed of the knife. In another instance, mother told father H.B. did not come home. Father called H.B. an Uber, and H.B. came home. On another occasion, H.B. posted on social media about a party on a street in a warehouse neighborhood. H.B.'s phone was off, but father went to the area and found him.

Father explained that his and mother's parenting styles were very different and often undermined each other. Father also explained that H.B. had tried to pit his parents against each other for his own benefit, another issue that he learned about in his parenting classes and wanted to work on. Father stated that while he disagreed at times with mother's way of punishing the children, he wanted to find an approach that he and mother could both feel good about and that would be helpful for H.B. Father felt that in recent contacts with mother they were mostly in agreement about how to take care of H.B.

Father said that he and H.B. "have always had a very good and close relationship." Father, however, acknowledged that H.B. had not been coming to visits with him. In father's view, H.B. likely did not want to attend the

18

visits due "to the mandated nature of it, having a third party analyze and focus on him." H.B. called father frequently, but father did not pick up the phone.

Father was living in a "basement apartment" that was a room with a bathroom. Father stated that his children could not live there. Father could not secure his own apartment because he was paying the rent and bills for the apartment where mother and the children were living, as well as the household expenses.

Wasacz testified she met H.B. in September 2022. H.B. frequently visited the school's wellness center, where students are referred when dealing with mental health challenges. Wasacz also met father around September 2022. Father "seemed like a very caring father." He worried about H.B. and "was very involved, . . . perceptive and responsive."

H.B. continued to struggle with mental health challenges and substance use. Mother had been trying to implement boundaries and set limits with H.B., who had difficulty adjusting because he enjoyed a lot of freedom previously. Wasacz noticed H.B.'s relationship with mother had improved in the last few months.

Wasacz believed it would be helpful for H.B. to have father in his life regularly, so long as father kept his own substance use issues in line. Wasacz testified the relationship between father and H.B. was strong, and H.B. responded to father. She believed that recent, infrequent communication with father was detrimental to H.B. She also thought that since father had left the home, H.B.'s struggles at school worsened. In the last month, H.B. had not been at school at all.

There was a recent IEP meeting in which mother and father worked together to make sure H.B. was receiving the help he needed. Wasacz

observed that mother and father were supporting each other and ensuring each was a part of the decisionmaking. Wasacz thought it was important for mother and father to work together to support H.B.

It was "confusing" to Wasacz when she learned that H.B. was not attending visits with father. H.B. said that he loved father and wanted to see him. However, H.B. told Wasacz he felt uncomfortable at the visits. According to Wasacz, H.B. struggled with strangers around. He also said that Wednesdays are short school days and that he wanted to hang out with his friends.

Following this testimony, the parties presented closing arguments. Counsel for the Agency reiterated its recommendation for the children to remain in the home of mother, that mother receive family maintenance services, and that father receive supportive services. Counsel acknowledged and praised father for his recent work towards sobriety, but argued that he was still very early in his recovery. Mother's counsel joined the Agency's recommendation.

Counsel for the minors believed that father was continuing to work on his sobriety in a way that mitigated the risk to himself in terms of relapsing and the safety of the children. Counsel also questioned the basis of the Agency's opinions regarding father's sobriety, criticizing how the Agency misunderstood father's drug tests and did not acknowledge the information that father had given the Agency regarding his future recovery plans. Thus, counsel argued the Agency's recommendation was "misinformed" and not entitled to credence. Counsel also criticized the Agency's inability to find three-hour slots for visitation or moving visits to another day as requested by H.B. Counsel argued it was in the children's best interests to give father either reunification services or family maintenance services. Counsel

"plead[ed] with the Court to reconsider the visitation order and the contact that they have."

Father's counsel acknowledged that "family reunification services aren't available under the law." So, counsel instead proposed that the juvenile court "could order family maintenance services to Father, and then Father as a custodial parent can make arrangements for his children to stay or be under the care of Mother so that their sleeping arrangements are that they stay in the family apartment but the Father has full and free access to his children."

According to father's counsel, the question before the court was whether the Agency had met its burden under section 361, subdivision (c)(1) to show, by clear and convincing evidence, there would be a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being and there was no reasonable way to protect the children from these dangers without removal. Counsel argued the Agency did not meet this burden. Counsel highlighted that father was regretful for his past decisions and had taken significant action in his recovery. Counsel also argued that the Agency "made little to no effort to assess whether [father] had mitigated the issues that brought this case in to the point of whether or not the children would be safe in his care." Counsel went on, "It is hard to believe that up until this point that has been the [A]gency's approach in trying to keep a family together." Counsel stressed, "[H.B.] needs his father."

The juvenile court then announced its decision. It stated it appreciated all the work that father had made towards his sobriety, "but there is a missing component." "[T]he missing component in this particular case, which objectively is shocking to the conscious, is that [this] particular vulnerable young person at 15 with all of his issues and concerns and mental health

disorders, that [father] uses drugs with him, and what is particularly disturbing is that he knew it was wrong." The court commented, "The gentleman's judgment is so poor that the agency has sustained their burden of proof."

The court went on: "The fact that [father] literally ODed on the street in San Francisco in 2022 you would think would scare the bejesus out of him or anybody else, yet four months later he completely relapses and is doing drugs with his young [son]. [¶] Now people may pooh-pooh marijuana in some ways. It is legal now, but it is legal for somebody who is 21 years of age, not a 15 year old, and not a 15 year old with all of [H.B.'s] mental health disorders. [¶] That is a concept that has not really been addressed by [father] and through his counsel. I don't know frankly how to address it per se except talking to his therapist, counselor about it. It is not just about him and his self-care, it is also about his parenting ability. [¶] And just saying, 'I have bad judgment and it was because of my addiction and it is because of my relapse' is insufficient."

The court stated it was proceeding under section 362, subdivision (c), not section 361, subdivision (c), because it was not ordering the removal of the children from the home and "[t]hey have remained with a custodial parent the entire time." The court declared H.B. and D.B. as dependents and ordered the placement of the children with mother and the provision of family maintenance services to mother and supportive services to father.

The court, however, stated that "[a]ssuming arguendo [it] is incorrect" in applying section 362, subdivision (c), it would find "that the [A]gency has sustained their burden of proof by clear and convincing evidence under [section] 361[, subdivision] (c)(1)." "There is a substantial danger to the young person due to the father's substance abuse issues and addiction[,]

22

coupled with . . . his willingness to use narcotics with a 15 year old coupled with, in addition to the special needs of [H.B.]" The court also found by clear and convincing evidence that reasonable efforts were made to prevent or eliminate the need for removal from the home and there were no reasonable means by which the children's health may be protected without removing them from the physical care and custody of father.

Finally, the court ordered that father have monitored visits with the children, subject to the Agency's discretion to allow unsupervised visits with 48 hours' notice. It also permitted father to have unsupervised phone calls and texts with the children.

This appeal followed.

## DISCUSSION

Father challenges the disposition findings and orders as to him.[5] He argues the juvenile court erred when it proceeded under section 362, subdivision (c) (section 362(c))—which applies to the situation in which a child is declared a dependent, but is retained in parental custody as part of a disposition order—rather than section 361, subdivision (c) (section 361(c))—which applies when a dependent child is removed from the physical custody of a parent.

Father, however, acknowledges the juvenile court found, in the alternative, that even if it was incorrect in concluding section 362(c) governed, it would conclude the Agency met its burden under section 361(c) to warrant the removal of the children from father's custody. He then argues that substantial evidence did not support this and other related findings under section 361.

_____

[5] Father does not challenge the jurisdiction order and findings.

23

The Agency responds that the juvenile court correctly proceeded under section 362(c), but that in any event, substantial evidence supports the removal findings under section 361(c).

We resolve the parties' disagreement regarding which statutory provision governed at disposition. We then address the sufficiency of the evidence arguments.

**The Governing Statutory Provisions**

The proper interpretation of a statute, and its application to undisputed facts, presents a question of law that is subject to de novo review. (See *In re Michael S.* (2016) 3 Cal.App.5th 977, 983 (*Michael S.*); *Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1058.)

Section 362(c) provides: "If a child is adjudged a dependent child of the court . . . and the court orders that a parent or guardian shall retain custody of the child subject to the supervision of the social worker, the parents or guardians shall be required to participate in child welfare services or services provided by an appropriate agency designated by the court."

On the other hand, section 361(c) applies when a juvenile court is considering removing a dependent child from the physical custody of his or her parent. Section 361(c), states in relevant part: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence [that]: [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical

24

custody." Subdivision (c)(1) identifies two alternatives for the juvenile court to consider "as a reasonable means to protect the minor," one of which, as relevant here, is "[t]he option of removing an offending parent from the home." (§ 361, subd. (c)(1)(A).)

Father argues (and the Agency does not dispute) that for purposes of section 361, subdivision (c)(1), he had physical custody of the children and that they resided with him at the time the original petition was initiated. However, the parties disagree on whether the juvenile court ordered the children removed from father's physical custody, such that it was required to make removal findings under section 361, subdivision (c)(1).

The Agency argued below that section 361(c) did not apply because it was not recommending the removal of the children from *all* parental custody—i.e., it was recommending that the children remain in the custody of mother in the family home. The juvenile court apparently agreed, stating: "Because the Court is not ordering a removal from the home, the young people will remain in the home the entire time. . . . The Court is not removing [H.B. and D.B.] from a custodial parent, so that is why under section 362(c), which I find is the appropriate statute to follow, the Court is going to order in-home with Mom, family maintenance with Mom, and supportive services for the father."

On appeal, the Agency argues this finding was correct. It contends "[t]he rigorous requirements of section 361 apply at disposition only when the court is considering removing a dependent child from the physical custody of a parent and ordering an out of home placement." And the Agency argues that neither occurred here. It adds that the juvenile court "avoided the necessity of removal by permitting [H.B.] and [D.B.] to remain in mother's

home and removing the offending parent—father" pursuant to section 361, subdivision (c)(1)(A).

The Agency and the juvenile court apparently relied on two premises. One is that section 361(c) precludes the possibility of removal from only one parent. Another premise is that the juvenile court could not order both the removal of father from the family residence and the removal of the children from father's custody pursuant to section 361, subdivision (c)(1). Father disagrees with these premises, as do we.

As cited in father's reply brief, *Michael S.*, *supra*, 3 Cal.App.5th at page 984 explains, section 361 "does refer in places to the possibility of removal from only one parent. For example, subdivision (c)(1) uses the singular possessive in stating that the court must determine that there are no reasonable means to protect the minor 'without removing the minor from the minor's *parent's* or *guardian's* physical custody.' (§ 361, subd. (c)(1), italics added.)" Further, while section 361, subdivision (c)(1)(A) "requires the court to consider the 'option' of removing an offending parent from the home as a possible alternative to removal of the child from the parent[,] . . . [i]t does not, by its terms, preclude the possibility of ordering both removal of the parent from the home and removal of the child from the parent." (*Michael S.*, at p. 984.)

*Michael S.* continued: "Flexibility in ordering removal from only one custodial parent makes sense in light of the many different custody arrangements that a juvenile court might need to address. For example, two parents might live apart and share custody of a child. In such situations, if only one parent engages in the conduct underlying a dependency petition, the juvenile court might conclude that it is appropriate to remove the child only from the offending parent and allow the child to remain in the other parent's

26

custody." (*Michael S.*, *supra*, 3 Cal.App.5th at pp. 984–985.) "Indeed, the facts here illustrate the different living arrangements that a juvenile court can confront. While Mother and Father lived with Michael in an apartment in Los Angeles at the time the relevant events occurred, they were not married and Father apparently had a separate residence in Apple Valley that the children had previously visited. Father left his family, initially on his own volition, after learning that law enforcement and social workers had made a visit. By the time the initial petition was filed, he was no longer at the home. While the juvenile court ordered Father to stay away from the family's residence and from the children, under the circumstances the juvenile court could also reasonably consider the option of removing Michael from Father's custody to confirm that, absent a further court order, Father was not permitted physical custody of Michael *at any location*." (*Id.* at p. 985, italics added.)[6]

*Michael S.*'s reasoning is persuasive. To the extent the juvenile court interpreted section 361(c) as foreclosing the possibility of ordering both the removal of one parent from the home and removal of the child from the parent, it was mistaken.

The question, then, is whether the juvenile court ordered both the removal of father from the home and, at the same time, the removal of the

---

[6] It is not uncommon for the juvenile court to remove a child from only one parent's custody when the parents do not live together. (See, e.g., *In re E.B.* (2010) 184 Cal.App.4th 568, 574 [children declared dependent based on the actions of both parents; appellate court upheld a dispositional order removing children from father and releasing them to mother], disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 450 [children ordered removed from the custody of father and placed in the home of mother]; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1210, 1213–1219 [child of divorced parents properly removed only from father's home].)

27

children from father's custody.  According to father, "[t]hat is precisely what the juvenile court did here."  He says that "[a]lthough the juvenile court stated it was not removing the children from a custodial parent, that is not accurate and does not reflect the outcome of its orders with respect to father's custodial rights."  Father explains:  "[W]hile the juvenile court placed the children with mother, the juvenile court also made orders removing the children from father's custody by restricting father from the family home and ordering supervised visitation.  The juvenile court both denied father's request to allow the children in the home with father able to visit them in the home pursuant to a timeshare agreement, and further ordered father's visitation with the children must be supervised, effectively removing the children from father's custody."

We agree with father's interpretation of the juvenile court's orders.  It not only restricted father from the family's residence but also did not permit physical custody of the children at any location.  (See *Michael S.*, *supra*, 3 Cal.App.5th at p. 985.)  It limited father's access to the children to visitation at a designated location under the supervision of the Agency.  Thus, although the juvenile court stated it was "not removing [the children] from a custodial parent," its orders effected a removal of the children from father's custody.  Indeed, the court repeated at the hearing that "[father] cannot have [the children] in his care and custody" and "there is no nexus that he would be safe to have [H.B.] or [D.B.] in his physical care and custody."

We therefore conclude the juvenile court's principal finding that section 362(c) applied was error, but that its alternative finding that section 361(c) applied was correct.

Accordingly, the juvenile court was required to make findings under section 361(c), as well as section 361, subdivision (e), which states that the court "shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) Here, the juvenile court made the requisite findings and factual recitations. It found by clear and convincing evidence there was or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if they were returned to father's custody, and that there were no reasonable means by which the children's physical health can be protected without removing them from father's physical custody. (§ 361, subd. (c)(1).) It then stated the facts upon which removal was based. (§ 361, subd. (e).) The court also found that reasonable efforts were made to prevent or eliminate removal. (*Ibid.*)[7]

We turn to father's arguments that insufficient evidence supported the juvenile court's findings under section 361, subdivisions (c)(1) and (e).

_____

[7] Father argues in passing that the juvenile court did not state the facts supporting the bases of its findings that there were no reasonable means of protecting the children without removal and that reasonable efforts were made to prevent or eliminate the need for removal. Father's failure to raise below the adequacy of the juvenile court's factual recitations precludes him from raising the issue on appeal. (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222.) The contention also lacks merit. As noted, section 361, subdivision (e) by its terms requires the court to state the facts on which its decision to remove is based and to make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal; it does not specify the court must state facts supporting the latter determination. The juvenile court's findings here complied with section 361, subdivision (e) for the reasons stated in the text.

**Sufficiency of the Evidence to Support the Disposition Findings**

We review the juvenile court's findings under section 361, subdivision (c)(1) for substantial evidence, " 'keeping in mind that the [juvenile] court was required to make its [findings] based on the higher standard of clear and convincing evidence.' " (*In re I.R.* (2021) 61 Cal.App.5th 510, 520; see *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1005.) Likewise, the substantial evidence standard of review applies to a finding under section 361, subdivision (e) that reasonable efforts were made to prevent or eliminate the need to remove a child from his or her parent. (See *In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924, superseded by statute on other grounds as stated in *In re Cody W.* (1994) 31 Cal.App.4th 221, 229–230.) In applying this standard, we "must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996; see *In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

### *Substantial Evidence Supports the Removal Findings*

Father argues substantial evidence does not support the finding, by clear and convincing evidence, that there would be a substantial danger to the children if returned to father's custody. (§ 361, subd. (c)(1).)[8] In father's

---

[8] The Agency argues, in a footnote, that substantial evidence supports the findings under section 361, subdivision (c)(1). The footnote does not include a discussion to support the argument. The text of the Agency's respondent's brief does contain a substantial evidence argument, but that argument appears to be directed at the juvenile court's determination under section 362. Thus, it is unclear whether that argument also applies to the removal findings under section 361, subdivision (c)(1).

view, "[t]he evidence did not demonstrate it was 'highly probable' that [he] would use illicit substances again or provide illicit substances to the children." Father points to evidence showing that by the time of the disposition hearing, he had been sober for four and a half months, had completed and was participating in several recovery programs and meetings, and had accepted responsibility for his poor decision to give his son illicit drugs.

Father's recent period of sobriety of four and a half months, while commendable, was apparently not enough to reassure the juvenile court that father's drug abuse was in the past. Father struggled with drug addiction since about 2000, meaning he had a history of substance abuse of over 23 years. He had " 'checked himself into rebab' " at least twice and had been connected to the NA community at various times. But he failed to benefit from substance abuse treatment programs or communities, as his periods of sobriety alternated with recurring drug use. Additionally, while father made promising recent developments in his recovery, the fact remains he was still in the early stages of recovery. Indeed, father's own witness, Pasinosky of the Family Treatment Court, considered father to be in the "orientation phase" of that court's program, which he had started in mid-August. Given father's decades-long history of substance abuse, and the fact he was in the early stages of recovery, the juvenile court could reasonably find it highly probable that father's four or so months of sobriety did not mean he was no longer at risk of relapsing.

Aside from father's substance abuse issues, the juvenile court noted the risk in this case was father's poor parenting ability. The record demonstrates father did not recognize the boundaries between a parent and a child, as clearly evidenced by his decision to give illicit drugs to his son, a teenager

31

struggling with anxiety, depression, and his own substance use. Although father points out he was engaged in parenting classes, the evidence supports a reasonable inference that he was in the early stages of improving his parenting skills. For example, father testified that one of H.B.'s behaviors that he had come to recognize was how H.B. manipulated his parents "for his benefit." In essence, H.B. was able to exploit the conflict between his parents and form an alliance with his father against mother, resulting in father allowing H.B. to get his way. Father testified that he learned about such behaviors through parenting classes, and that being able to coparent with mother was "something among the many other things that [he] would like to see worked on if possible."

Additionally, the evidence showed that father continued to struggle with setting boundaries with his children. As PSW Cordero testified, during visits father was "very willing to say yes to his kids" whenever they asked him to buy things or do activities. Cordero explained that "even though you expect parents to provide for their kids, to me that is a bit concerning . . . because there's times in which you do need to say no to your kids."

On this record, the juvenile court could reasonably conclude that despite father's participation in parenting classes, he had not yet demonstrated sufficient progress in eliminating the conditions that led to the dependency.

For these reasons, we conclude substantial evidence supports the juvenile court's finding by clear and convincing evidence that there was or would be a substantial danger to the children if they were returned to father's care.

Father next asserts insufficient evidence supports the juvenile court's finding that there were no reasonable means by which the children's physical

health could be protected without removal. (§ 361, subd. (c)(1).) He argues: "Since [he] had already left the family home, the juvenile court could have issued an order that father could not reside in the family home as a 'reasonable means' to protect the children without removing them from father's custody. The juvenile court could then have issued orders allowing [him] to have access to the children under a specific timeshare even though he was residing in a different location. . . . At the same time, the Agency could make unannounced visits during father's timeshare, interviewed the parents and children on a regular basis, arranged weekly random drug testing for father and kept in regular contact with father's service providers and H.B.'s service providers." In father's view, "[a] disposition order allowing H.B. to have the greatest amount of unfettered access to father was in H.B.'s best interests." We are unpersuaded.

Consistent with section 361, subdivision (c)(1)(A), the juvenile court considered the option of ordering, and did order, the continued removal of father from the family home. And contrary to father's arguments, there was substantial evidence from which the court could reasonably conclude that granting father "unfettered access" to the children, even with unannounced home visits by the Agency and the provision of services, was not a viable alternative to removal.

H.B. had attended only three visits with father between the first scheduled visit on September 6 and the first day of the disposition hearing on November 2, mainly because H.B. wanted to hang out with his friends instead.[9] H.B. told his school's social worker that he felt uncomfortable with

---

[9] To the extent father faults the Agency for the lack of visits, such contention is misplaced. It is true that H.B. gave a couple of suggestions on how the Agency could help encourage him to attend visits, including separating his visits with father from father's visits with D.B., as well as

the visits. This was apparent to PSW Cordero, who observed H.B. seemed anxious or nervous and not very engaged during the first visit, though this improved during the third visit. In addition, as noted above, father's "willing[ness] to say yes" to his children's various requests at visits continued to raise concerns about his ability to set appropriate boundaries with his children. Further, father had only been sober for a brief period of about four and a half months while in a treatment environment. As a result, his ability to maintain his—as well as his son's—sobriety outside a treatment program was untested. Under these circumstances, the juvenile court could reasonably conclude by clear and convincing evidence that granting father "unfettered access" to the children, even with unannounced Agency visits and the provision of services, was not a sufficiently reliable means to protect the children.

### *Insufficient Evidence Supports the Reasonable Efforts Finding*

We next address father's challenge to the sufficiency of the evidence to support the finding that reasonable efforts were made to prevent or eliminate the need for removal, a challenge with which we agree.

"The Agency has a duty to ensure that 'reasonable efforts [are] made to prevent or eliminate removal' of the [c]hildren." (*In re M.V.* (2022) 78 Cal.App.5th 944, 964.) "[R]easonable efforts, like reasonable services, need only be reasonable under the circumstances, not perfect." (*In re H.E.* (2008) 169 Cal.App.4th 710, 725.) Here, we cannot say that the record, even when viewed in the light most favorable to the Agency, contains substantial

---

moving the day of the visits. However, the record shows the Agency could not grant these requests due to circumstances beyond the Agency's control, specifically the unavailability of staff and resources, as father acknowledges.

evidence that it made reasonable efforts to prevent or eliminate the need for removal.

As noted, the record demonstrates that the sources of danger to the well-being of the children while in father's care were father's substance abuse and his poor parenting skills. The Agency's detention report listed as "reasonable efforts" to prevent removal its referral for father to submit to drug testing and a substance use assessment. The reasonable efforts noted in the disposition report included a meeting with father on September 6 and a request for release of records from Kaiser, where father was enrolled in his second treatment program at the time. The Agency did not expressly list its reasonable efforts in the addendum report for the reporting period, but the report summarized the results of father's substance use assessment and drug test results from Kaiser.

Notwithstanding the above, father argues that reasonable efforts were not made to prevent removal, primarily stemming from concerns about his substance abuse. Father contends that the assigned social worker, PSW Navidad, (1) did not ask him about his future substance abuse recovery plans; (2) relied on "her own very limited experience" and did not speak to her supervisor or otherwise "obtain[] a professional opinion" to corroborate her opinion that she needed more than three months to assess father's ability to maintain long-term sobriety; and (3) did not do enough to understand his drug test results.

We are not persuaded by the second argument. It essentially asks us to reweigh the evidence and make credibility findings, which we may not do under the substantial evidence standard of review. (See *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996.)

Father's first and third arguments, however, are well taken. We address his third argument first, which is that the Agency failed to make reasonable efforts to understand father's drug test results in the three months leading up to the disposition hearing. Father points to PSW Navidad's testimony where she was asked if she thought father was "using illegal illicit drugs that he [was] not prescribed." She replied that father tested "presumptive positive but his levels were decreasing," and "that his substance use levels [were] going down." Navidad added, "[S]o we see that he is getting sober." In so testifying, Navidad apparently understood that father was merely decreasing his use of illicit substances, rather than stopped his use altogether.

However, according to father's physician, although father tested positive for benzodiazepines and THC, this did not indicate " 'new use.' " Also, although father tested positive for buprenorphine, Pasinosky explained that buprenorphine (which also goes by the name Suboxone) is medication father had been prescribed to treat his substance use disorder. Thus, to the extent Navidad believed father continued to use illicit drugs in the three or so months before the disposition hearing, she was "misinformed" about father's then-current progress in recovery, as minors' counsel argued. Indeed, Navidad testified she did not know what the drugs being tested were and could not recall if she had previously looked them up.

We turn to father's first argument, which is that Navidad failed to ask him about his plans to maintain sobriety after completing the second Kaiser treatment program. The Agency's addendum report stated father had "not identified what his plans are . . . after he completes his outpatient program to the Agency" and that his "plans for support around recovery past November [were] unknown." Father asserts that "his plans were only

'unknown' because the social worker failed to ask him about them." This is not in dispute. PSW Navidad testified she did not ask father about his plans for recovery after completing the second Kaiser program. She explained she had not done so because she and father had not yet had their monthly meeting as of November 2. But father later testified on December 20 that they recently had communicated, but that Navidad still had not asked him about his recovery plans.

Therefore, the record reflects that although the Agency asked father to provide information about his recovery (i.e., his medical records and substance use assessment), it did not take meaningful steps to follow up on the information given to it. Consequently, the Agency was both misinformed about father's progress in sobriety in the months leading up to the disposition hearing, and uninformed about his plans to maintain sobriety in the long run—facts that were significant to a judgment about whether the children could be safely returned to father.

But assuming the evidence was sufficient to show the Agency made reasonable efforts to mitigate concerns about father's substance abuse, we do not reach the same conclusion with respect to its efforts to mitigate concerns about father's deficient parenting ability. In its September 15 disposition report, the Agency opined that father needed to "improve his parenting skills to be able to meet his children's needs in an appropriate manner." Father argues that he received no referral to parenting classes. It is true that the Agency did not mention in any of its reports that it had referred father to parenting classes. However, PSW Navidad testified at the disposition hearing on November 2 that the supportive services recommended to father in the disposition report, including parenting classes for adolescents, had been referred to father "as of today." To the extent there is a conflict

37

regarding whether the Agency referred father to parenting classes, it must be resolved in favor of the Agency. (See *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996.)

But even if the Agency did refer father to parenting classes, there is no indication it ever followed up on the referral by verifying father's enrollment or discussing with him his progress in those classes. It is difficult to comprehend the purpose of referring a parent for classes with no investigation into the parent's progress or lack thereof, particularly in a case where the juvenile court was concerned about father's parenting ability just as much as, if not more than, his substance abuse issues.

Further, neither the Agency's reports nor testimony from its social workers specified when the referral to parenting classes was made. The earliest reference in the record to father's enrollment in parenting classes is in his trial brief filed on October 27, days before the disposition hearing. In any event, it is safe to say there is no evidence that the referral to parenting education was made promptly after the children were detained, thereby providing father with sufficient time and opportunity to make meaningful progress before the disposition hearing. Indeed, as discussed above, we may infer that father was not too far into his parenting classes as of the disposition hearing, considering his testimony that he was still enrolled in classes as of December 18 and that he was still learning to recognize some areas in his parenting that he had yet to work on. Had the parenting education referral been made earlier, father could well have made further progress in improving his parenting skills.

Moreover, and relatedly, it was unreasonable for the Agency not to follow up with father regarding his progress in individual therapy and

38

counseling, services that the court posited could have helped father address his poor decisionmaking.

In sum, although the Agency may have referred father to various services, it does not appear on this record that it assisted him in any meaningful way to avoid the children's removal from his custody. We find no substantial evidence to support the juvenile court's finding that reasonable efforts were made to prevent or eliminate the need for removal.

As stated above, under section 361, subdivision (e), the juvenile court may not order a child removed from parental custody without finding that reasonable efforts were made to prevent or eliminate the need for removal. Because we conclude the juvenile court's finding in this regard is not supported by substantial evidence, we reverse the disposition order and remand the matter for a new disposition hearing. On remand, the juvenile court is to make its decision based on the facts existing at the time of the new disposition hearing. (See *In re Ashly F.* (2014) 225 Cal.App.4th 803, 811.)

## DISPOSITION

The jurisdiction findings are affirmed. The disposition order is reversed and remanded for a new disposition hearing in compliance with section 361 and the views expressed in this opinion.

RICHMAN, J.

WE CONCUR:

STEWART, P. J.
DESAUTELS, J.

39

Filed 10/29/2024; after nonpublished opinion filed 10/8/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re H.B. et al., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>H.B.,<br><br>     Defendant and Appellant. | A169493<br><br>(San Francisco City & County Super. Ct. Nos. JD23-3241, JD23-3241A)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter, filed on October 8, 2024, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105,

1

it is hereby ordered that the opinion should be published in the Official Reports.


Dated: _____

Stewart, P. J.

San Francisco City & County

Trial Judge:     Hon. Braden C. Woods

Patricia K. Saucier, under appointment by the Court of Appeal for Defendant and Appellant.

David Chiu, City Attorney; Kimiko Burton and Elizabeth McDonald Muniz for Plaintiff and Respondent.